Kevin Barry
QUINNIPIAC UNIVERSITY SCHOOL OF LAW
LEGAL CLINIC
275 Mount Carmel Ave.
Hamden, Connecticut 06518
*Counsel for Amici Curiae*
legalclinic@quinnipiac.edu

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JANE DOE, | : | Hon. Michael A. Shipp, U.S.D.J. |
| Plaintiff, | : | Hon. Douglas E. Arpert, U.S.M.J. |
| v. | : | |
| ARRISI, et al., | : | Civil Action No. 3:16-CV-08640 |
| | : | |
| Defendants. | : | |
| | : | **BRIEF OF *AMICI CURIAE* BAY AREA** |
| | : | **LAWYERS FOR INDIVIDUAL** |
| | : | **FREEDOM, GAY & LESBIAN** |
| | : | **ADVOCATES & DEFENDERS,** |
| | : | **NATIONAL CENTER FOR LESBIAN** |
| | : | **RIGHTS, NATIONAL CENTER FOR** |
| | : | **TRANSGENDER EQUALITY,** |
| | : | **NATIONAL LGBT BAR** |
| | : | **ASSOCIATION, TRANSGENDER** |
| | : | **LEGAL DEFENSE & EDUCATION** |
| | : | **FUND, AND WHITMAN-WALKER** |
| | : | **CLINIC, INC. IN OPPOSITION TO** |
| | : | **DEFENDANTS' MOTION TO DISMISS** |
| | : | **PLAINTIFF'S AMENDED** |
| | : | **COMPLAINT** |
| | : | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

STATEMENT OF INTEREST OF AMICI CURIAE................................................... vii

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 2

ARGUMENT.............................................................................................................. 3

**I. Transgender Status and Gender Dysphoria** ......................................................... 5

**II. Defendants' Refusal to Change the Inaccurate Sex Classification on Plaintiff's Birth Certificate Absent SRS Constitutes Discrimination Based on Disability** ............................... 9

    A. The SRS Requirement is Intentionally Discriminatory Because It Denies an Accurate Birth Certificate to a Subclass of People With Gender Dysphoria. ...................................... 11

    B. The SRS Requirement is Discriminatory in Effect Because It Screens Out a Subclass of People with Gender Dysphoria from Obtaining an Accurate Birth Certificate.................18

    C. Defendants Have Failed to Reasonably Modify the SRS Requirement for a Subclass of People with Gender Dysphoria........................................................................ 20

**III. Plaintiff is a Qualified Individual with a Disability Under the ADA and Rehabilitation Act**.................................................................................................22

    A. Gender Dysphoria is Not Excluded Under the ADA or Rehabilitation Act ................. 22

    B. Plaintiff's Gender Dysphoria Meets the Definition of Disability Under the ADA and Rehabilitation Act........................................................................................... 26

    C. Plaintiff is a "Qualified Individual" Because She Meets the Essential Eligibility Requirements for Receipt of an Accurate Birth Certificate, With or Without Reasonable Accommodation. ............................................................................................. 27

CONCLUSION............................................................................................................ 28

APPENDIX.........................................................................................................attached

# TABLE OF AUTHORITIES

**Cases**

*Adkins v. City of New York*, 143 F. Supp. 3d 134 (S.D.N.Y. 2015) ..................................... 1, 14, 24

*Baxter v. Pennsylvania Department of Corrections*, 661 Fed. Appx. 754 (3d Cir. 2016)............ 20

*Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*,
    208 F. Supp. 3d 850 (S.D. Ohio 2016).................................................................................. 1, 24

*Blatt v. Cabela's Retail, Inc.*, No. 5:14-CV-04822, 2017 WL 2178123
    (E.D. Pa. May 18, 2017)........................................................................................................ 23

*Bragdon v. Abbott*, 524 U.S. 624 (1998) ......................................................................................... 4

*Brocksmith v. United States*, 99 A.3d 690 (D.C. 2014) ................................................................. 1

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) ......................................... 2, 26

*Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996) .................................................................... 19

*Doe 1 v. Trump*, No. 17–1597, 2017 WL 4873042 ............................................................. 1, 24, 25

*Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267 (W.D. Pa. 2017) ........................ 1, 24

*Frederick L. v. Dep't of Public Welfare*, 364 F.3d 487 (3rd Cir. 2004) ................................... 3, 23

*G.G. ex rel. Grimm v. Gloucester County School Bd.*, 822 F.3d 709 (4th Cir. 2016),
    *vacated and remanded on other grounds*, 137 S. Ct. 1239 (U.S. 2017) .................................. 16

*Galloway v. Superior Court of the District of Columbia*, 816 F. Supp. 12 (D.D.C. 1993) .... 13, 22

*Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) ........................................................................ 25

*Hason v. Med. Bd. of California*, 279 F.3d 1167 (9th Cir. 2002)................................................... 4

*Helen L. v. DiDario*, 46 F.3d 325 (3rd Cir. 1995) ................................................................. passim

*Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003)................................................... 10, 20, 21

*Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657
    (W.D. Pa. 2015)..................................................................................................................... 23

*Lapid Ventures, LLC v. Twp. of Piscataway*, No. CIV. 10-6219 WJM, 2011 WL 2429314
    (D.N.J. June 13, 2011)............................................................................................................ 9

*Muhammad v. Court of Common Pleas of Allegheny County, Pa.*, 483 Fed. Appx. 759 (3d Cir.
    2012)....................................................................................................................................... 3

*New Directions Treatment Services v. City of Reading*, 490 F.3d 293 (3d Cir. 2007)................ 12

*Noel v. N.Y. City Taxi & Limousine Comm'n*, 687 F.3d 63 (2d Cir. 2012) ................................... 4

*Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004).............................................................................. 12

*Romer v. Evans*, 517 U.S. 620 (1996)........................................................................................... 26

*School Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273 (1987)............................................. 11

*Schroer v. Billington*, 424 F. Supp. 2d 203 (D.D.C. 2006).......................................................... 16

*Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004) .................................................................. 25

*Soto v. City of Newark*, 72 F. Supp. 2d 489 (D.N.J. 1999) .......................................................... 21

*Strathie v. Department of Transp.*, 716 F.2d 227 (3d Cir. 1983)................................................. 21

*U. S. Department of Agriculture v. Moreno*, 413 U.S. 528 (1973) ...............................................26

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034
   (7th Cir. 2017) ............................................................................................ 1, 23, 24, 25
*Williams v. Philadelphia Housing Authority Police Dept.*, 380 F.3d 751 (3d Cir. 2004) ............ 22
*Yeskey v. Com. of Pa. Dept. of Corrections*, 118 F.3d 168 (3rd Cir. 1997),
   *aff'd*, 524 U.S. 206 (U.S. 1998) ................................................................................ 3, 4

**Statutes**

28 C.F.R. § 35.103 ................................................................................................................ 4
28 C.F.R. § 35.108(a)(2)(i) .................................................................................................. 26
28 C.F.R. § 35.108(a)(2)(iii) ............................................................................................... 27
28 C.F.R. § 35.108(d)(1)(i) .................................................................................................. 26
28 C.F.R. § 35.130(a) ........................................................................................................... 9
28 C.F.R. § 35.130(b) ........................................................................................................... 9
28 C.F.R. §§ 35.130(b)(1) .................................................................................................. 12
28 C.F.R. §§ 35.130(b)(1)(iv) ............................................................................................ 12
28 C.F.R. § 35.130(b)(1)(3)(i) ............................................................................................ 18
28 C.F.R. § 35.130(b)(7)(i) ........................................................................................... 20, 21
28 C.F.R. § 42.503(a) ........................................................................................................... 9
28 C.F.R. § 42.503(b) ........................................................................................................ 9, 12
28 C.F.R. § 42.503(b)(3) ..................................................................................................... 18
28 C.F.R. § 42.503(d) .......................................................................................................... 12
28 C.F.R. pt. 35, app. B .................................................................................................. 12, 19
29 U.S.C. §705(9)(B) .......................................................................................................... 26
29 U.S.C. § 705(20)(B) ....................................................................................................... 26
29 U.S.C. § 705(20)(F)(i) .................................................................................................... 23
29 U.S.C. § 794(a) ......................................................................................................... 3, 4, 9
42 U.S.C. § 12101(a)(5) ........................................................................................................ 1
42 U.S.C. § 12102 ............................................................................................................... 26
42 U.S.C. § 12102(1)(B) ..................................................................................................... 27
42 U.S.C. § 12102(2)(B) ................................................................................................. 26,27
42 U.S.C. § 12102(3)(A) ..................................................................................................... 27
42 U.S.C. § 12102(4)(A) ..................................................................................................... 26
42 U.S.C. § 12102(4)(B) ..................................................................................................... 26
42 U.S.C. § 12102(4)(D) ..................................................................................................... 26
42 U.S.C. § 12102(4)(E)(i) ................................................................................................. 26
42 U.S.C. § 12131(1) ............................................................................................................. 4
42 U.S.C. § 12131(2) ........................................................................................................... 27
42 U.S.C. § 12132 ............................................................................................................. 3, 9
42 U.S.C. § 12201(a) ............................................................................................................. 4
42 U.S.C. § 12211(b) ........................................................................................................... 23
42 U.S.C. § 12211(b)(1) ................................................................................................. 22,24
42 U.S.C. §§ 12101-13 ........................................................................................................ 26
42 U.S.C. §12102(1)(A) ...................................................................................................... 27

N.J. STAT. ANN. § 26:8-23 ................................................................................... 4, 28

N.J. STAT. ANN. § 26:8-40.12 ................................................................................. 3, 15

N.J. STAT. ANN. § 26:8-49 ...................................................................................... 19

N.J. STAT. ANN. § 26:8-53 ...................................................................................... 20

N.J. STAT. ANN. § 39:3-10h ................................................................................... 15

**Other Authorities**

135 Cong. Rec. S10753-10755, *available at* 1989 WL 183115 (daily ed. Sep. 7, 1989)
(statement of Sen. Armstrong) ........................................................................... 25

135 Cong. Rec. S10765-10803, *available at* 1989 WL 183216 (daily ed. Sep. 7, 1989)
(statements of Sen. Helms and Sen. Rudman) ...................................................... 25

135 Cong. Rec. S11173-11178, *available at* 1989 WL 183785 (daily ed. Sep. 14, 1989)
(supplemental statement of Sen. Armstrong) ........................................................ 25

AMERICAN MEDICAL ASSOCIATION, CONFORMING BIRTH CERTIFICATE POLICIES TO CURRENT
MEDICAL STANDARDS FOR TRANSGENDER PATIENTS H-65.967 (2014) ................................... 14

American Medical Association, *AMA Calls for Modernizing Birth Certificate Policies:
Requirements for Changing Sex Designations Do Not Reflect Current Medical Options*
(June 9, 2014) ................................................................................................ 14

AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL
DISORDERS (5th ed. 2013) ............................................................................... passim

American Society of Anethesiologists, *Surgery Risks* ....................................................... 9

Baudewijntje P.C. Kreukels & Antonio Guillamon, *Neuroimaging Studies in People with
Gender Incongruence,* 28 INT'L REV. PSYCHIATRY 120 (2016) .......................................... 17

Brief of Amici Curiae Gay & Lesbian Advocates & Defenders et al. in Opp'n to Def.'s Part'l
Mot. Dismiss at 6, Blatt v. Cabela's Retail, Inc., No. 5:14-cv-4822-JFL, 2015 WL 1322781
(E.D. Pa. Jan. 23, 2015), ECF No. 33 ................................................................... 23, 24

Christine Michelle Duffy, *The Americans with Disabilities Act of 1990 and the Rehabilitation
Act of 1973*, *in* GENDER IDENTITY AND SEXUAL ORIENTATION DISCRIMINATION IN THE
WORKPLACE: A PRACTICAL GUIDE ch. 16 (Christine Michelle Duffy ed. Bloomberg BNA
2014) ................................................................................................... passim

DAVID L. ROWLAND & LUCA INCROCCI, HANDBOOK OF SEXUAL AND GENDER IDENTITY
DISORDERS (2008) ............................................................................................ 16

DOJ, THE AMERICANS WITH DISABILITIES ACT, TITLE II TECHNICAL ASSISTANCE
MANUAL .......................................................................................... 13, 19, 27

EEOC, ENFORCEMENT GUIDANCE: REASONABLE ACCOMMODATION AND UNDUE HARDSHIP
UNDER THE AMERICANS WITH DISABILITIES ACT ..................................................... 10

Elesline Hoekzema et al., *Regional Volumes and Spatial Volumetric Distribution of Gray Matter
in the Gender Dysphoric Brain,* 55 PSYCHONEUROENDOCRINOLOGY 59 (2015) ...................... 18

JAIME M. GRANT, ET AL., INJUSTICE AT EVERY TURN: A REPORT OF THE NATIONAL
TRANSGENDER DISCRIMINATION SURVEY, NAT'L CTR. FOR TRANSGENDER EQUALITY AND
NAT'L GAY AND LESBIAN TASK FORCE (2011) ......................................................... 7, 9, 13

Kevin Barry & Jennifer Levi, *Blatt v. Cabela's Retail, Inc. and a New Path for Transgender
Rights*, 127 THE YALE LAW JOURNAL FORUM 373 (2017) ................................................. 23

Kevin M. Barry et al., *A Bare Desire to Harm: Transgender People and the Equal Protection Clause*, 57 B.C. L. REV. 507 (2016) ............................................................................. 23, 24, 25

Milton Diamond, *Biased-Interaction Theory of Psychosexual Development: "How Does One Know if One Is Male or Female?,"* 55 SEX ROLES 589 (2006)................................................. 17

NEW JERSEY MOTOR VEHICLE COMMISSION, DECLARATION OF GENDER DESIGNATION CHANGE FOR NEW JERSEY MOTOR VEHICLE COMMISSION (MVC) DRIVER LICENSE OR IDENTIFICATION CARD ....................................................................................................................................... 15

P.T. Cohen-Kettenis & L.J.G. Gooren, *Transsexualism: A Review of Etiology, Diagnosis and Treatment*, 46 J. OF PSYCHOSOMATIC RES. 315 (1999) ..................................................... 16, 17

Pl.'s Mem. Law in Opp'n Def.'s Mot. Dismiss, Doe v. Dzurenda, No. 3:16-CV-1934 (D. Conn. June 28, 2017), ECF No. 39-1 ............................................................................ 23, 24

Pl.'s Mem. Law in Opp'n Def.'s Part'l Mot. Dismiss, Blatt v. Cabela's Retail, Inc., No. 14-4822, 2015 WL 1360179, (E.D. Pa. Jan. 20, 2015), ECF No. 23 ............................ 24, 25

Randi Kaufman, *Introduction to Transgender Identity and Health, in* HARVEY J. MAKADON ET AL., FENWAY GUIDE TO LESBIAN, GAY, BISEXUAL AND TRANSGENDER HEALTH (2008).......... 17

Russell B. Toomey et al., *Gender-Nonconforming Lesbian, Gay, Bisexual, and Transgender Youth: School Victimization and Young Adult Psychosocial Adjustment*, 46 DEVELOPMENTAL PSYCHOL. 1580 (2010) .......................................................................................................... 17

Ruth Colker, *Homophobia, AIDS Hysteria, and the Americans with Disabilities Act*, 8 J. GENDER RACE & JUST. 33 (2004)....................................................................................... 25

Stat. of Int. of U.S., Doe v. Arrisi, No. 3:16-cv-08640, ECF No. 49 ........................................ 23

Stat. of Int. of U.S., Doe v. Dzurenda, No. 3:16-CV-1934 (D. Conn. Oct. 27, 2017), ECF No. 57 No. 67........................................................................................................... 23

Statement of Int. of U.S., Blatt v. Cabela's Retail, Inc., No. 5:14-CV-04822 (E.D. Pa. Nov. 16, 2015), ECF No. 67.......................................................................... 5, 18, 23

Transgender Law Center, State-by-State Overview: Rules for Changing Gender Markers on Birth Certificates (April 2017) ..............................................................................................21, 28

U.S. OFFICE OF PERSONNEL MANAGEMENT, GUIDANCE REGARDING THE EMPLOYMENT OF TRANSGENDER INDIVIDUALS IN THE FEDERAL WORKPLACE............................................. 5, 7, 17

WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, STANDARDS OF CARE 5 (7th ed. 2012)..................................................................................................................... 5, 7, 8

## STATEMENT OF INTEREST OF *AMICI CURIAE*

Bay Area Lawyers for Individual Freedom ("BALIF") is a bar association of about 500 lesbian, gay, bisexual, and transgender ("LGBT") members of the San Francisco Bay Area legal community. As the nation's oldest and one of the largest LGBT bar associations, BALIF promotes the professional interests of its members and the legal interests of the LGBT community at large. To accomplish this mission, BALIF actively participates in public policy debates concerning the rights of LGBT people. For more than thirty years, BALIF has appeared as *amicus curiae* in cases where it believes it can provide valuable perspective and argument that will inform court decisions on matters of broad public importance.

Gay & Lesbian Advocates & Defenders ("GLAD") is a New England-wide legal rights organization that seeks equal justice for all persons under the law regardless of their sexual orientation, gender identity, or HIV/AIDS status. The Transgender Rights Project of GLAD seeks to establish clear legal protections for the transgender community through public impact litigation and law reform. *See, e.g., Rosa v. Park West Bank*, 214 F.3d 213 (1st Cir. 2000); *Doe v. Yunits*, No. 001060A, 2000 WL 33162199 (Mass. Super. Oct. 11, 2000); *O'Donnabhain v. Commissioner*, 134 T.C. 34 (T.C. 2010); *Doe v. Regional School Unit 26*, 86 A.3d 600; *In re Mallon, Transsexual Surgery*, DAB No. 2576 (2014).

The National Center for Lesbian Rights ("NCLR") is a national non-profit law firm with headquarters in San Francisco and an office in Washington, D.C. NCLR seeks legal protection for lesbian, gay, bisexual, and transgender people through impact litigation, public policy advocacy, public education, direct legal services, and collaboration with other social justice organizations and activists. Each year, NCLR serves more than 500 people in California, and more than 5,000 people in all fifty states.

The National Center for Transgender Equality ("NCTE") is a national social justice organization devoted to ending discrimination and violence against transgender people through education and advocacy on issues of national importance to transgender people. Founded in 2003, NCTE advocates for policy reform at the federal level on a wide range of issues affecting transgender people, including employment discrimination; provides technical assistance to organizations and institutions at the state and local levels; and works to create greater public understanding of issues affecting transgender people.

The National LGBT Bar Association ("LGBT Bar") is a non-partisan, membership-based professional association of lawyers, judges, legal academics, law students, and affiliated lesbian, gay, bisexual and transgender legal organizations. The LGBT Bar is committed to fighting discrimination against lesbian, gay, bisexual, and transgender people, and to promoting justice in and through the legal profession for the lesbian, gay, bisexual, and transgender community in all its diversity.

Founded in 2003, Transgender Legal Defense & Education Fund ("TLDEF") is a non-profit whose mission is to end discrimination and achieve equality for transgender people. TLDEF's strategies include path-breaking trans rights cases and *amicus* briefs challenging discrimination in the areas of employment, health care, education, and public accommodations.

Whitman-Walker Clinic, Inc., d/b/a Whitman-Walker Health ("Whitman-Walker"), is a nonprofit, community-based Federally Qualified Health Center serving the Washington, D.C. metropolitan area, Suburban Maryland, and Northern Virginia. Established in 1973, Whitman-Walker was one of the first to engage in HIV/AIDS treatment and prevention research and is nationally renowned for its commitment to LGBT health. Whitman-Walker is also home to one of the nation's oldest medical-legal partnerships and is active in legal matters of concern to the

LGBT community, including access to healthcare, protections against discrimination, and transgender legal issues. In calendar year 2016, Whitman-Walker provided health care services to more than 1,200 patients who identified as transgender, and legal assistance to more than 650 individuals who identified as transgender or gender nonconforming. Since 2012, Whitman-Walker has offered monthly name and gender change clinics to the transgender community that have served almost 800 unique individuals to date.

Amici respectfully submit this brief in opposition to the Defendants' Motion to Dismiss the Plaintiff's Amended Complaint in order to address the vital importance of allowing individuals to bring claims under the ADA and Rehabilitation Act when such individuals have been discriminated against on the basis of gender dysphoria, and also to discuss the application of federal disability rights law to discrimination based on gender dysphoria. Only one court in the Nation has analyzed whether the ADA's exclusion of gender identity disorders and transsexualism (the "GIDs Exclusion") applies to gender dysphoria in light of the ADA's text, structure, and legislative history. *See Blatt v. Cabela's Retail, Inc.*, No. 5:14-CV-04822, 2017 WL 2178123, at *4 (E.D. Pa. May 18, 2017) (denying defendant's partial motion to dismiss and holding that the ADA does not exclude gender dysphoria). No court has analyzed whether an identical exclusion under the Rehabilitation Act applies to gender dysphoria. Furthermore, no reported court decision has addressed the elements of a *prima facie* claim of disability discrimination under the ADA and Rehabilitation Act in the context of an individual with gender dysphoria who was denied government benefits. As a result, no decision has discussed whether a state's refusal to change the sex classification on the birth certificate of an individual with gender dysphoria absent surgery is intentionally discriminatory, discriminatory in effect, and/or a failure to accommodate in violation

of the ADA and Rehabilitation Act. Additionally, no decision has addressed the meaning of "sex" and "gender"/"gender identity" in this context.

A motion requesting leave to file was submitted in tandem with this brief. No party's counsel authored this brief in whole or in part, and *amici* and its counsel have not received any remuneration for their participation in this proceeding from either party or other interested individuals.

## INTRODUCTION

People with disabilities and transgender people share in common a lengthy and tragic history of societal prejudice and neglect. In passing the Americans with Disabilities Act of 1990 ("ADA"), Congress recognized this history when it declared that "people with disabilities, as a group, occupy an inferior status in our society," and continually encounter various forms of discrimination, including "outright intentional exclusion" as well as "overprotective rules and policies," the "failure to make modifications to existing . . . practices," "exclusionary qualification standards and criteria," and "relegation to lesser services." 42 U.S.C. § 12101(a)(5). Similarly, lower federal courts have consistently recognized that transgender people represent a "historically persecuted and politically powerless" class who "face discrimination, harassment, and violence because of their gender identity." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *Doe 1 v. Trump*, No. 17–1597, 2017 WL 4873042, at *2.[1]

This case implicates transgender people *with* a disability, namely gender dysphoria, which is the clinically significant distress that some transgender people experience as a result of identifying with the sex different than the one assigned at birth. The State of New Jersey requires

---

[1] *See also Whitaker*, 858 F.3d at 1051 (applying "heightened review" under Equal Protection Clause); *Doe 1*, 2017 WL 4873042, at *27-28 (concluding that "[a]s a class, transgender individuals have suffered, and continue to suffer, severe persecution and discrimination" and applying "a heightened degree of scrutiny" under Equal Protection Clause); *accord. Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288-289 (W.D. Pa. 2017) (concluding that "transgender people as a class have historically been subject to discrimination or differentiation" and applying "an intermediate standard of Equal Protection review"); *Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016) (concluding that transgender people "are stigmatized for their gender non-conformity in a variety of settings" and that "heightened scrutiny is appropriate" under the Equal Protection Clause); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015) (stating that "transgender people have suffered a history of persecution and discrimination" and "are a quasi-suspect class" under the Equal Protection Clause); *see also Brocksmith v. United States*, 99 A.3d 690, 698 n.8 (D.C. 2014) ("[T]he hostility and discrimination that transgender individuals face in our society today is well-documented.").

the Plaintiff, a transgender woman with gender dysphoria, to have a birth certificate that says she is "male." The State requires her to do this because she will not undergo a particular form of invasive medical treatment that is unnecessary, contraindicated, or infeasible for the treatment of her gender dysphoria. This is discrimination based on disability in violation of the ADA and Rehabilitation Act.

As Justice Thurgood Marshall memorably stated in his partial concurrence in the landmark case of *City of Cleburne v. Cleburne Living Center*, which struck down a local ordinance that discriminated against people with intellectual disabilities:

> the case of what once was a "natural" and "self-evident" ordering later comes to be seen as an artificial and invidious constraint on human potential and freedom. Shifting cultural, political, and social patterns at times come to make past practices appear inconsistent with fundamental principles upon which American society rests.

473 U.S. 432, 466 (U.S. 1985) (Marshall, J., concurring in part and dissenting in part). For this proposition, Justice Marshall cited no less than *Brown v. Board of Education*, which overturned *Plessy v. Ferguson*'s "separate but equal" doctrine. *Id.* This case implicates a similar constraint on the potential and freedom of transgender people with gender dysphoria, who have for too long been "shunted aside, hidden and ignored." *Helen L. v. DiDario*, 46 F.3d 325, 330 (3rd Cir. 1995) (citation omitted). *Amici* respectfully urge this Court to deny the Defendant's Motion to Dismiss the Plaintiff's ADA and Rehabilitation Act claims.[2]

## STATEMENT OF FACTS

Amici adopt and incorporate in their entirety the factual allegations set forth in the Amended Complaint.

---

[2] Amici agree with Plaintiff that this Court should hold that Defendants' refusal to permit her to change the sex classification on her birth certificate without proof that she has undergone SRS also violates due process and equal protection. *See* Compl. ¶ 15. This brief does not address those arguments.

## ARGUMENT

In the Amended Complaint, Plaintiff Jane Doe alleges that the Defendants' refusal to change the sex classification on her birth certificate absent proof of SRS pursuant to New Jersey law[3] violates Title II of the ADA and the Rehabilitation Act of 1973.[4]  According to the Third Circuit:

> [t]o establish a violation of Title II of the ADA, a plaintiff must allege that: (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability.

*Muhammad v. Court of Common Pleas of Allegheny County, Pa.*, 483 Fed. Appx. 759, 762 (3d Cir. 2012). "The requirements for a claim under § 504 of the Rehabilitation Act are the same as those under the ADA, with the additional requirement that a plaintiff alleging a violation of the [Rehabilitation Act] demonstrate that the violation was committed by a program or activity receiving 'Federal financial assistance,'" *id.* at 762-63 (citations omitted), and without the requirement that the program be provided by a "public entity," *see Yeskey v. Com. of Pa. Dept. of Corrections*, 118 F.3d 168, 170 (3rd Cir. 1997), *aff'd*, 524 U.S. 206 (U.S. 1998).  Given these similarities, "[t]he law developed under section 504 of the Rehabilitation Act is applicable to Title II of the ADA." *Helen L.*, 46 F.3d at 330 n.7; *see also Frederick L. v. Dep't of Public Welfare*,

---

[3] *See* N.J. STAT. ANN. § 26:8-40.12 ("The State registrar shall issue an amended certificate of birth to a person born in this State who undergoes sex reassignment surgery and requests an amended certificate of birth which shows the sex and name of the person as it has been changed.").

[4] Title II of the ADA states, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act states, in relevant part, that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).

364 F.3d 487, 491 (3rd Cir. 2004) ("We have construed the provisions of the [Rehabilitation Act] and the ADA in light of their close similarity of language and purpose.").[5]

Plaintiff adequately alleges the requisite elements under the ADA and the Rehabilitation Act: (1) she is a "qualified individual with a disability"; (2) the issuance of accurate birth certificates is a service, program, or activity, and, as required by the ADA, Defendants are a "public entity"; (3) Defendants have discriminated against the Plaintiff based on disability by denying her an accurate birth certificate based on her failure to undergo surgery to treat her gender dysphoria; and (4) as required by the Rehabilitation Act, Defendants receive federal financial assistance.

Defendants do not dispute the second and fourth elements.[6] This brief therefore focuses on the first and third elements, in the order raised by Defendants: i.e., whether Plaintiff has adequately alleged "exclusion or discrimination based on a disability," and whether "her alleged disability, GD, . . . qualif[ies] as a disability under either [the ADA or Rehabilitation Act]." Mot. Dismiss Am. Compl. at 31-32.

---

[5] Congress, in the ADA, required courts "to construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act." *Bragdon v. Abbott*, 524 U.S. 624, 632 (1998) (citing 42 U.S.C. § 12201(a)); *accord.* 28 C.F.R. § 35.103.

[6] Defendants do not dispute that they are a "public entity" for purposes of the ADA. *See* 42 U.S.C. § 12131(1) (defining "public entity" to mean "any State or local government" and "any department, agency . . . or other instrumentality of a State or States or local government"). Defendants also do not dispute that the "prompt and accurate" registration of births, N.J. STAT. ANN. § 26:8-23, is a "service, program, or activity" under the ADA and Rehabilitation Act. *See Yeskey*, 118 F.3d at 170-71 (stating that "[t]he statutory definition of '[p]rogram or activity' in Section 504 indicates that the terms were intended to be all-encompassing," and broadly interpreting Section 504 and Title II of the ADA to "appl[y] to anything a public entity does") (citing DOJ regulations under the Rehabilitation Act and ADA); *see also Noel v. N.Y. City Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) ("[T]he phrase 'services, programs, or activities' has been interpreted to be 'a catch-all phrase that prohibits all discrimination by a public entity.'"); *Hason v. Med. Bd. of California*, 279 F.3d 1167, 1172–73 (9th Cir. 2002) ("[T]he ADA's broad language brings within its scope anything a public entity does."). Lastly, Defendants do not dispute that they receive federal financial assistance. *See* 29 U.S.C. § 794(a).

## I. Transgender Status and Gender Dysphoria

To understand Defendants' discrimination based on gender dysphoria, it is first helpful to understand the meaning of "transgender." A transgender person is someone whose gender identity—that is, an individual's internal sense of being male or female—does not align with his or her assigned sex at birth.[7] Usually, people born with the physical characteristics of males psychologically identify as men, and those with the physical characteristics of females psychologically identify as women. However, for a transgender person, this is not true; the person's body and the person's gender identity do not match.[8] A growing body of medical research suggests that this incongruence is caused by biological influences such as neurology, hormones, and genetics.[9]

For many transgender people, this incongruence between gender identity and assigned sex does not interfere with their lives; they are completely comfortable living just the way they are.[10]

---

[7] *See, e.g.*, AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 451 (5th ed. 2013) [hereinafter "DSM-5"]; U.S. OFFICE OF PERSONNEL MANAGEMENT, GUIDANCE REGARDING THE EMPLOYMENT OF TRANSGENDER INDIVIDUALS IN THE FEDERAL WORKPLACE [hereinafter "OPM GUIDANCE"], http://www.opm.gov/policy-data-oversight/diversity-and-inclusion/reference-materials/gender-identity-guidance/; *see also* app. A (compiling sections of DSM-5).

[8] DSM-5, *supra* note 7, at 452-53.

[9] *See, e.g.*, Christine Michelle Duffy, *The Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973, in* GENDER IDENTITY AND SEXUAL ORIENTATION DISCRIMINATION IN THE WORKPLACE: A PRACTICAL GUIDE ch. 16-77 (Christine Michelle Duffy ed. Bloomberg BNA 2014) (discussing recent medical studies pointing to biological etiology for transgender identity); Sec. Statement of Int. of U.S. at 5-6, Blatt v. Cabela's Retail, Inc., No. 5:14-CV-04822 (E.D. Pa. Nov. 16, 2015), ECF No. 67 [hereinafter DOJ *Blatt* Statement] (same); *see also* DSM-5, *supra* note 7, at 457 (discussing genetic and, possibly, hormonal contribution to gender dysphoria); *see also infra* note 34.

[10] *See* WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, STANDARDS OF CARE 5 (7th ed. 2012) [hereinafter "SOC"], *available at* https://s3.amazonaws.com/amo_hub_content/Association140/files/Standards%20of%20Care%20V7%20-%202011%20WPATH%20(2)(1).pdf; *see also* DSM-5, *supra* note 7, at 453 (stating that, in addition to a marked incongruence between gender identity and assigned sex, individuals with gender dysphoria exhibit "distress about this incongruence").

For some transgender people, however, the incongruence results in gender dysphoria—i.e., a feeling of stress and discomfort with one's assigned sex.[11]   Such gender dysphoria, if clinically significant and persistent, is a serious medical condition.   According to the fifth version of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*, gender dysphoria is characterized by: (1) a marked incongruence between one's gender identity and one's assigned sex, which is often accompanied by a strong desire to be rid of one's primary and secondary sex characteristics and/or to acquire primary/secondary sex characteristics of the other gender; and (2) intense emotional pain and suffering resulting from this incongruence.[12] Among adolescents and adults, gender dysphoria often begins in early childhood, around the ages of 2-3 ("Early onset gender dysphoria"), but it may also occur around puberty or even later in life ("Late-onset gender dysphoria").[13]   If left medically untreated, gender dysphoria can result in debilitating depression, anxiety and, for some people, suicidality and death.[14]   In addition to the negative health conditions directly attributable to gender dysphoria, people with gender dysphoria are frequently subjected to discrimination in multiple areas of their lives (e.g., housing, employment, school, healthcare, interactions with police and other government officials) that exacerbates these negative health outcomes.[15]

---

[11] DSM-5, *supra* note 7, at 451 ("Gender dysphoria as a general descriptive term refers to an individual's affective/cognitive discontent with the assigned gender but is more specifically defined when used as a diagnostic category.").

[12] *See* DSM-5, *supra* note 7, at 452; *see also id.* ("The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.").

[13] *Id.* at 455-56.

[14] *Id.* at 454-55.

[15] *See id.* at 458 ("Gender dysphoria . . . is associated with high levels of stigmatization, discrimination, and victimization, leading to negative self-concept, increased rates of mental disorder comorbidity, school dropout, and economic marginalization, including unemployment, with attendant social and mental health risks, especially in individuals from resource-poor family backgrounds. In addition, these individuals' access to health services and mental health services

Like other medical conditions, gender dysphoria can be ameliorated through medical treatment.[16] There is no single course of medical treatment that is appropriate for every person with gender dysphoria. Instead, the World Professional Association For Transgender Health, Inc. ("WPATH") (formerly known as "The Harry Benjamin International Gender Dysphoria Association, Inc."), has established internationally accepted Standards of Care ("SOC") for the treatment of gender dysphoria.[17] The SOC were originally approved in 1979 and have undergone seven revisions through 2012. As part of the SOC, many transgender individuals with gender dysphoria undergo a medically-recommended and supervised gender transition in order to live life consistent with their gender identity.[18]

The current SOC recommend an individualized approach to gender transition, consisting of a medically-appropriate combination of hormone therapy, "living part time or full time in another gender role, consistent with one's gender identity," surgery, and/or psychotherapy.[19] To complete their medical transition, some transgender individuals may only need to live part time or

---

may be impeded by structural barriers, such as institutional discomfort or inexperience in working with this patient population."); *see also* JAIME M. GRANT, ET AL., INJUSTICE AT EVERY TURN: A REPORT OF THE NATIONAL TRANSGENDER DISCRIMINATION SURVEY, NAT'L CTR. FOR TRANSGENDER EQUALITY AND NAT'L GAY AND LESBIAN TASK FORCE 2 (2011), http://www.thetaskforce.org/static_html/downloads/reports/reports/ntds_full.pdf [hereinafter NATIONAL SURVEY] (discussing discrimination against transgender people in a range of settings, including "in childhood homes, in school systems that promise to shelter and educate, in harsh and exclusionary workplaces, at the grocery store, the hotel front desk, in doctors' offices and emergency rooms, before judges and at the hands of landlords, police officers, health care workers and other service providers").

[16] SOC, *supra* note 10, at 5; *see also* DSM-5, *supra* note 7, at 451 (stating that "many [individuals] are distressed *if* the desired physical interventions by means of hormone and/or surgery are not available") (emphasis added).

[17] *See* SOC, *supra* note 10, at 1.

[18] *See id.* at 9-10; *see also* OPM GUIDANCE, *supra* note 7 (discussing gender transition).

[19] SOC, *supra* note 10, at 9.

7

full time in their desired gender role without undergoing hormone therapy or surgery.[20]  Others

may decide with their health care provider that it is medically necessary for them to undergo

hormone therapy and/or surgery as well.[21]

The correct course of treatment for any given individual, in order for the patient to achieve

genuine and lasting comfort with his or her sex, "is individualized: What helps one person alleviate

gender dysphoria might be very different from what helps another person."[22]  According to the

SOC:

> [W]hile many individuals need both hormone therapy and surgery to alleviate their gender
> dysphoria, others need only one of these treatment options and some need neither. . . . Often
> with the help of psychotherapy, some individuals integrate their trans- or cross-gender
> feelings into the gender role they were assigned at birth and do not feel the need to feminize
> or masculinize their body.  For others, changes in gender role and expression are sufficient
> to alleviate gender dysphoria.  Some patients may need hormones, a possible change in
> gender role, but not surgery; others may need a change in gender role along with surgery,
> but not hormones.  In other words, treatment for gender dysphoria has become more
> individualized.[23]

Significantly, "[i]n addition (or as an alternative) to the psychological and medical treatment

options . . . , other options [that] can be considered to help alleviate gender dysphoria" include

"[c]hanges in name and gender marker on identity documents."[24]

In sum, SRS is one of *several* medical treatments for gender dysphoria.  For many people

with gender dysphoria, non-surgical interventions are all that is necessary to alleviate their

---

[20] *Id.* at 8 ("[W]hile many individuals need both hormone therapy and surgery to alleviate their
gender dysphoria, others need only one of these treatment options and some need neither."); *see
also* DSM-5, *supra* note 7, at 454 (discussing those who resolve incongruence between gender
identity and assigned sex "*without* seeking medical treatment to alter body characteristics")
(emphasis added).

[21] SOC, *supra* note 10, at 10; *see also* DSM-5, *supra* note 7, at 453 (recognizing "cross-sex medical
procedure[s] or treatment regimen[s]—namely, regular cross-sex hormone treatment or gender
reassignment surgery confirming the desired gender").

[22] SOC, *supra* note 10, at 5.

[23] *Id.* at 8-9.

[24] *Id.* at 10.

condition.   Furthermore, even if SRS is otherwise necessary to alleviate a person's gender dysphoria, there are many reasons why that person may not undergo it.   For example, it may be contraindicated by a preexisting health condition, such as obesity, high blood pressure, heart disease, smoking history, obstructive sleep apnea, or allergies to anesthesia, or the person may not be able to afford it.[25]

## II. Defendants' Refusal to Change the Inaccurate Sex Classification on Plaintiff's Birth Certificate Absent SRS Constitutes Discrimination Based on Disability.

Title II of the ADA prohibits a public entity from discriminating against a qualified person with a disability by "exclud[ing]" the person "from participation in" or "deny[ing] the benefits of" a "public service, program, or activity," or by "subject[ing]" the person "to discrimination."   42 U.S.C. § 12132; 29 U.S.C. § 794(a).   DOJ regulations reiterate this general prohibition, 28 C.F.R. §§ 35.130(a), 42.503(a), and also provide a list of specific actions that constitute discrimination, *id.* § 35.130(b); § 42.503(b).   *See also Helen L.*, 46 F.3d at 330 ("Because Title II was enacted with broad language and directed the Department of Justice to promulgate regulations . . ., *the regulations* which the Department promulgated *are entitled to substantial deference.*") (emphasis in original).   "A plaintiff may prove a violation of the . . . ADA . . . in one of three ways: (1) showing disparate treatment, also termed intentional discrimination, (2) showing disparate impact, or (3) showing a refusal to make reasonable accommodations."   *Lapid Ventures, LLC v. Twp. of*

---

[25]   *Compare*   American   Society   of   Anethesiologists,   *Surgery   Risks*, https://www.asahq.org/whensecondscount/patients%20home/preparing%20for%20surgery/surge ry%20risks (discussing preexisting health conditions that may increase the risk of surgery, including "high blood pressure, heart disease . . . diabetes, stroke, seizures or other neurological disorders, obesity, obstructive sleep apnea, lung conditions [such as asthma] . . . kidney problems, allergies to anesthesia or a history of adverse reactions to anesthesia," as well as "[s]moking, or drinking two or more alcoholic beverages a day"), *with* NATIONAL SURVEY, *supra* note 15, at 138 ("The costs of transition-related surgeries, which are rarely covered by health insurance, are beyond the reach of most transgender people, particularly because the community experiences such high rates of employment discrimination and poverty.").

*Piscataway*, No. CIV. 10-6219 WJM, 2011 WL 2429314, at *5 (D.N.J. June 13, 2011). The Plaintiff has adequately alleged that Defendants discriminated against her based on gender dysphoria under each of these three theories.

Before discussing the three ways in which the Defendants have discriminated against Plaintiff, it should first be noted that Defendants' discrimination is undoubtedly based on "disability." Defendants appear to argue that their refusal to change the male sex classification on the Plaintiff's birth certificate absent SRS is not discrimination under the ADA and Rehabilitation Act because it is not based on Plaintiff's *disability*; rather, it is based on Plaintiff's failure to undergo SRS. *See* Defs.' Br. Supp. Mot. Dismiss Am. Compl. at 32, ECF No. 69-3. This is a distinction without a difference.

By requiring SRS in order to receive an accurate birth certificate, Defendants discriminate against Plaintiff based on how she *treats* her disability—i.e., without surgery. *See, e.g.*, EEOC, ENFORCEMENT GUIDANCE: REASONABLE ACCOMMODATION AND UNDUE HARDSHIP UNDER THE AMERICANS WITH DISABILITIES ACT ¶ 38 & n.106, https://www.eeoc.gov/policy/docs/accommodat ion.html#N_106_ (stating that differential treatment based on one's failure "to take medication, to obtain medical treatment, or to use an assistive device (such as a hearing aid)" is discrimination based on disability, and noting that "[t]here are many reasons why a person would choose to forgo treatment, including expense and serious side effects")*; see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 279 (2d Cir. 2003) (holding that district court "did not clearly err in concluding, in effect, that the plaintiffs' disabilities were a substantial cause of their inability to obtain services, or that that inability was not so remotely or insignificantly related to their disabilities as not to be 'by reason' of them"). Just as differential treatment because of a person's *failure to treat* a condition

10

is discrimination based on disability, so too is discrimination based on the *type of treatment* someone pursues for a medical condition.

In short, a covered entity cannot force a person to treat a medical condition—or treat a medical condition in a preferred way—in order to receive a benefit. *See id.* This is exactly what New Jersey law does: it forces the Plaintiff to treat her gender dysphoria with an unnecessary, contraindicated, or infeasible form of medical intervention in order to receive an accurate birth certificate. Defendants cannot escape this conclusion by claiming that the SRS requirement is not based on disability. *Cf. School Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 281-82 (U.S. 1987) (rejecting defendants' argument that termination of employee based on others' fears of contagiousness did not constitute discrimination based on "disability" under Rehabilitation Act).

### A. The SRS Requirement is Intentionally Discriminatory Because It Denies an Accurate Birth Certificate to a Subclass of People With Gender Dysphoria.

The male "sex" classification on Plaintiff's birth certificate is inaccurate: although the Plaintiff "was classified as male sex at birth because she had male genitals," she is female. Am. Compl. ¶¶ 3, 54-55. Specifically, her gender identity—the primary determinant of sex—is female; she has undergone hormone therapy, which means that she has the exact same sex hormones circulating in her body as a woman who was assigned the female sex at birth; and, as a result of such therapy, she has female secondary sex characteristics, including breasts. *Id.* ¶¶ 47, 57.

By classifying the Plaintiff as the wrong sex on her birth certificate—i.e., the sex assigned to her at birth on the basis of external genitalia alone, rather than the sex that accords with her gender identity (which is the primary determinant of sex) as well as other aspects of sex such as hormones and secondary sex characteristics—the SRS requirement discriminates against the Plaintiff. Specifically, New Jersey's SRS requirement denies an accurate birth certificate to people with gender dysphoria who do not treat their condition through SRS. As a result, people with

11

gender dysphoria who do not need or undergo SRS, like Plaintiff, are the *only* people who are refused an accurate birth certificate. All others receive an accurate birth certificate—namely, non-transgender people who, by definition, are accurately identified at birth, and transgender people who treat their gender dysphoria through SRS and are thus able to obtain an accurate birth certificate after undergoing surgery.

The SRS requirement is therefore facially discriminatory because it provides "different or separate aids, benefits, or services"—namely, *inaccurate* as opposed to accurate birth certificates—"to . . . [a] *class of individuals with disabilities* than is provided to others. . . ." 28 C.F.R. §§ 35.130(b)(1)(iv) (emphasis added);[26] *accord.* 28 C.F.R. § 42.503(b); *see, e.g., New Directions Treatment Services v. City of Reading*, 490 F.3d 293, 305 (3d Cir. 2007) (holding that Pennsylvania zoning law that "facially singles out methadone clinics, and thereby methadone patients, for different treatment, thereby render[s] the statute facially discriminatory"); *id.* at 301 (stating that "a statute that facially discriminates against disabled individuals" faces a "skeptical inquiry under the ADA and Rehabilitation Act"); *Rodde v. Bonta*, 357 F.3d 988, 997-98 (9th Cir. 2004) (holding that closure of hospital providing "rehabilitative services and treatment for complex and disabling medical conditions, such as paralysis and conditions associated with severe diabetes" likely violated ADA because it "would deny certain disabled individuals meaningful access to government-provided services because of their unique needs, while others would retain access to the same class of services"); *id.* at 997 (stating that closure of hospital "that provides

---

[26] Other DOJ Title II regulations likewise support this theory of intentional discrimination. *See, e.g.,* 28 C.F.R. §§ 35.130(b)(1), § 35.130(d); *see also* 28 C.F.R. § 42.503(d) (Rehabilitation Act); *id.* pt. 35, app. B ("[T]hese provisions are intended to prohibit exclusion and segregation of individuals with disabilities and the denial of equal opportunities enjoyed by others, based on, among other things, presumptions, patronizing attitudes, fears, and stereotypes about individuals with disabilities.").

services disproportionately required by the disabled and available nowhere else in the County [wa]s simply *not* [a] . . . facially neutral reduction" of services); *Galloway v. Superior Court of the District of Columbia*, 816 F. Supp. 12, 16-19 & n.5 (D.D.C. 1993) (rejecting "the assumption that visual observation is an essential function or attribute of a juror's duties," and holding that categorical exclusion of blind people from juries violated Rehabilitation Act and ADA based, in part, on: lack of evidence that visual capacity is an essential function of a juror that cannot be reasonably modified in individual cases, such as through "word pictures"; laws in ten states forbidding the exclusion of blind jurors; and no similar exclusion of *deaf* jurors); *see also Helen L.*, 46 F.3d at 335 ("The ADA is intended to insure that qualified individuals receive services in a manner consistent with basic human dignity rather than a manner which shunts them aside, hides, and ignores them.") (citation omitted); *see also* DOJ, THE AMERICANS WITH DISABILITIES ACT, TITLE II TECHNICAL ASSISTANCE MANUAL at II-3.2000-3000, https://www.ada.gov/taman2.html [hereinafter DOJ TITLE II MANUAL] (stating that discrimination would include the refusal "to admit an individual to a city council meeting that is open to the public merely because the individual is deaf," the requirement that applications to participate in a government program be filed "in a second-floor office of a building without an elevator" that is inaccessible to people who use wheelchairs, or "the use of printed information alone" that is inaccessible to people with vision impairments).

Importantly, the consequences of such discrimination are significant. An inaccurate birth certificate discloses to all the world that a person with gender dysphoria is transgender and accordingly exposes that person to the risk of violence and other adverse treatment. Am. Compl. ¶¶ 14, 77, 79, 86, 88; *see also* NATIONAL SURVEY, *supra* note 15, at 138, 154 ("Legal and bureaucratic barriers to amending transgender people's identity documents marginalize and

13

stigmatize transgender people. . . . Whenever people with incongruent identification documents must produce them, they are potentially revealed as transgender, whether to an employer, clerk, police officer, or airport personnel. Each of these 'outings' presents the possibility for disrespect, harassment, discrimination or violence . . . ."); *accord. Adkins*, 143 F. Supp. 3d at 139 ("A mismatch between the gender indicated on the [birth certificate] and the gender of the holder calls down discrimination."). In order to avoid such disclosure, some people with gender dysphoria may seek invasive surgery that they would not otherwise. *See* Am. Compl. ¶¶ 72, 78, 88. Such discrimination therefore places a subclass of people with gender dysphoria in a double bind: transition without surgery and risk violence and other adverse treatment, or undergo invasive medical surgery that one otherwise would not in order to avoid such risk. In recognition of the negative consequences of inaccurate birth certificates for people who do not need or undergo SRS, the American Medical Association has called for the "elimination of any requirement that individuals undergo gender affirmation surgery in order to change their sex designation on birth certificates and supports modernizing state vital statistics statutes to ensure accurate gender markers on birth certificates."[27]

Defendants attempt to avoid the conclusion that the Plaintiff's birth certificate is inaccurate by drawing a hard-and-fast distinction between "sex" and "gender" that simply does not exist. *See*

---

[27] AMERICAN MEDICAL ASSOCIATION, CONFORMING BIRTH CERTIFICATE POLICIES TO CURRENT MEDICAL STANDARDS FOR TRANSGENDER PATIENTS H-65.967 (2014), https://policysearch.ama-assn.org/policyfinder/detail/transgender%20?uri=%2FAMADoc%2FHOD.xml-0-5096.xml; *see also* American Medical Association, *AMA Calls for Modernizing Birth Certificate Policies: Requirements for Changing Sex Designations Do Not Reflect Current Medical Options* (June 9, 2014), *available at* http://www.marketwired.com/press-release/ama-calls-for-modernizing-birth-certificate-policies-1918754.htm ("For many transgender people, a needless operation should not be a government requirement to amend a sex designation on a birth certificate.") (quoting AMA President Ardis Dee Hoven, M.D.).

14

Mot. to Dismiss Am. Compl. at 32 ("[B]irth certificates reflect sex rather than gender.").[28] As

Plaintiff argues in the Amended Complaint, "sex" and "gender" are closely intertwined. *See* Am.

Compl. ¶ 52 ("[S]ex is defined synonymously with gender."); *see also id.* ¶¶ 79, 99 (discussing

Defendants' refusal to recognize Plaintiff's gender "under the broader definition of 'sex'").

New Jersey law, for example, does not recognize a distinction between "sex" and "gender."

On the contrary, New Jersey statutes and regulations repeatedly conflate "sex" and

"gender"/"gender identity." *Compare* N.J. STAT. ANN. § 26:8-40.12 (authorizing person born in

New Jersey to "request[] an amended certificate of birth which shows *the sex* and name of the

person as it has been changed") (emphasis added), *with* NEW JERSEY DEPARTMENT OF HEALTH,

OFFICE OF VITAL STATISTICS AND REGISTRY, CERTIFICATE OF SEX REASSIGNMENT VIA SURGICAL

PROCEDURE (Aug. 2016), *available at* Pl.'s Br. Opp'n Mot. Dismiss, Tab E, Doe v. Arrisi, No.

3:16-cv-08640, ECF No. 17-1 (requiring physician to certify that person seeking amended birth

certificate in New Jersey "has undergone surgical procedure(s) that have caused the individual's

*gender* to be changed to . . . Female [or] . . . Male") (emphasis added); *compare also* N.J. STAT.

ANN. § 39:3-10h (listing information contained in New Jersey driver's license, including, among

other things, "*gender*") (emphasis added), *with* NEW JERSEY MOTOR VEHICLE COMMISSION,

DECLARATION OF GENDER DESIGNATION CHANGE FOR NEW JERSEY MOTOR VEHICLE COMMISSION

(MVC) DRIVER LICENSE OR IDENTIFICATION CARD, http://www.state.nj.us/mvc/pdf/Licenses/

genderchange.pdf (requiring person seeking to "change the *gender designation* on [one's] driver

license/identification card to read . . . M or F" to certify that the "request for change of *sex*

---

[28] Notably, Plaintiff's birth certificate contains only a classification for "sex." *See* Ex. A of Compl. at 2, Doe v. Arrisi, No. 3:16-cv-08640, ECF No. 62-1 (Sept. 22, 2017) (attaching Plaintiff's New Jersey birth certificate). It does *not* contain a narrower classification for "external genitalia" and the corresponding options of "penis" and "vagina."

*designation* is for the purpose of making my driver license identification card reflect my *gender identity*," and requiring physician to certify that "the applicant's *gender identity* is . . . Male [or] Female and can reasonably be expected to continue as such for the foreseeable future") (emphasis added).

The relationship between "sex" and "gender" also finds support in the burgeoning scientific literature.[29] Since the beginning of the twentieth century, researchers have established that external genitalia alone does not establish one's sex.[30] Instead, an individual's "sex" depends primarily on

---

[29] *See generally* Duffy, *supra* note 9, at 16-55 to -57 (compiling scientific studies demonstrating "multifaceted nature of a person's sex").

[30] P.T. Cohen-Kettenis & L.J.G. Gooren, *Transsexualism: A Review of Etiology, Diagnosis and Treatment*, 46 J. OF PSYCHOSOMATIC RES. 315, 318 (1999) ("[T]he process of sexual differentiation, of becoming male or female, is not completed with the formation of external genitalia (the criterion for a newborn child's gender assignment). Also, the brain undergoes a differentiation into male or female . . . ."); DAVID L. ROWLAND & LUCA INCROCCI, HANDBOOK OF SEXUAL AND GENDER IDENTITY DISORDERS 327 (2008) ("[W]e [have] come to realize that an endpoint as seemingly simple as our sex . . . represents a continuum consisting of many dimensions: the biological, the psychological, the social, and the cultural."), *quoted in* Duffy, *supra* note 9, at 16-55; Duffy, *supra* note 9, at 16-55 to -56 ("Today, 'sex' is understood as a mosaic of characteristics that come together to define our sex"); *cf. G.G. ex rel. Grimm v. Gloucester County School Bd.*, 822 F.3d 709, 721 (4th Cir. 2016), *vacated and remanded on other grounds*, 137 S. Ct. 1239 (U.S. 2017) ("[T]he [dictionary] definitions [of 'sex'] also suggest that a hard-and-fast binary division on the basis of reproductive organs—although useful in most cases—was not universally descriptive."); *Schroer v. Billington*, 424 F. Supp. 2d 203, 213 (D.D.C. 2006) ("[S]cientific observation may well confirm . . . that sex is not a cut-and-dried matter of chromosomes.") (citation omitted).

"gender identity,"[31] which is an individual's internal sense of being male or female.[32] Other factors, such as hormones and secondary-sex characteristics, also play a role.[33] External genitalia are, therefore, but one component of sex and not always determinative of a person's sex; a person's sex depends primarily on gender identity. Although there is not yet one definitive explanation for what determines gender identity, biological factors, most notably sexual differentiation in the brain, have a role in gender identity development.[34]

---

[31] *See* Baudewijntje P.C. Kreukels & Antonio Guillamon, *Neuroimaging Studies in People with Gender Incongruence,* 28 INT'L REV. PSYCHIATRY 120, 120 (2016) ("[T]he largest difference [between men and women] may be found in gender identity . . . ."); Cohen-Kettenis & Gooren, *supra* note 30, at 318 (stating that "the process of sexual differentiation" includes "brain sexual differentiation"); *see also* Milton Diamond, *Biased-Interaction Theory of Psychosexual Development: "How Does One Know if One Is Male or Female?,"* 55 SEX ROLES 589, 596 n.13 (2006), *available at* www.hawaii.edu/PCSS/biblio/articles/2005to2009/2006-biased-interaction.html ("It is not the presence or absence of a penis but the sex of the brain—how it has developed—that determines how one comes to identify as male or female and how one wants to live.").

[32] *See, e.g.,* Russell B. Toomey et al., *Gender-Nonconforming Lesbian, Gay, Bisexual, and Transgender Youth: School Victimization and Young Adult Psychosocial Adjustment,* 46 DEVELOPMENTAL PSYCHOL. 1580, 1581 (2010) (defining "gender identity" as "the maleness and femaleness a person feels on the inside; how that identity is projected to the world; and how others mirror that identity back to the individual"); *accord.* OPM GUIDANCE, *supra* note 7 (defining "gender identity"). The Plaintiff's definition of the word "gender" in the Complaint is synonymous with "gender identity." *Compare* Compl. ¶ 4 ("'Gender' means a person's classification of themselves as male, female or other."), *with* OPM GUIDANCE, *supra* note 7 ("[G]ender identity is the individual's internal sense of being male or female or an identity other than the traditional definitions of male or female.").

[33] *See* Duffy, *supra* note 9, at 16-60 to -62 (stating that "'sex' is composed of a multitude of factors. . . . Perhaps the greatest irony in this discussion is that the 'traditional,' at-birth indicator of sex—does the newborn have a clitoris or penis?—may well be the least important indicator, whereas gender identity may be the most important.").

[34] *See, e.g.,* Diamond, *supra* note 31, at 596 n.13 ("During prenatal development the nervous system, the brain in particular, is programmed along a track that is usually concomitant with the development of other sex appropriate structures like genitals and reproductive organs. The brain, however, as in other [i]ntersex conditions, can develop along one sex/gender path while other organs develop along another. Put simply, the brain can develop as male while other parts of the body develop as female."); Randi Kaufman, *Introduction to Transgender Identity and Health, in* HARVEY J. MAKADON ET AL., FENWAY GUIDE TO LESBIAN, GAY, BISEXUAL AND TRANSGENDER HEALTH 337–38 (2008) ("The predominating biological theory suggests that a neurohormonal disturbance takes place in the brain during embryological development. While the genitalia of the

In most cases, one's external genitalia (the factor primarily used when assigning sex at birth) align with one's gender identity.  People born with the external genitalia of males typically identify psychologically as men, and those with the external genitalia of females typically identify psychologically as women.  However, for individuals who have aspects of their sex that are not in alignment—i.e., those who are transgender—the person's external genitalia and the person's gender identity do not align.[35]  Because gender identity—not external genitalia—is the primary factor in establishing one's sex, a transgender man's sex is male and a transgender woman's sex is female.

## B. The SRS Requirement is Discriminatory in Effect Because It Screens Out a Subclass of People with Gender Dysphoria from Obtaining an Accurate Birth Certificate.

By prohibiting a subclass of people with gender dysphoria—i.e., those who do not undergo SRS—from obtaining accurate birth certificates, the SRS requirement is also discriminatory in effect.  Specifically, the requirement violates the ADA's prohibition on "utiliz[ing] criteria or methods of administration . . . [t]hat *have the effect of* subjecting qualified individuals with disabilities to discrimination on the basis of disability," 28 C.F.R. § 35.130(b)(1)(3)(i) (emphasis added); *accord.* 28 C.F.R. § 42.503(b)(3), as well as the ADA's prohibition on "eligibility criteria that screen out or tend to screen out . . . any class of individuals with disabilities from fully and

---

human embryo become differentiated as male or female during the 12th week of fetal development, the gender identity portion of the brain differentiates around the 16th week.  If there is a hormonal imbalance during this four-week period, gender identity may not develop along the same lines as the genitalia."), *quoted* in Duffy, *supra* note 9, at 16-71; *see also* DOJ *Blatt* Statement, *supra* note 9, at 3-4 (compiling studies supporting "biologic etiology for transgender identity"); Elesline Hoekzema et al., *Regional Volumes and Spatial Volumetric Distribution of Gray Matter in the Gender Dysphoric Brain,* 55 PSYCHONEUROENDOCRINOLOGY 59, 60 (2015) (discussing biological factors contributing to gender dysphoria); Duffy, *supra* note 9, at 16-77 (discussing recent medical studies pointing to biological etiology for transgender identity); *see also* DSM-5, *supra* note 7, at 457 (discussing genetic and, possibly, hormonal contribution to gender dysphoria).

[35] *See* DSM-5, *supra* note 7, at 452-53.

18

equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered," *id.* § 35.130(b)(8). *See, e.g., Helen L.*, 46 F.3d at 335 (declining to construe ADA "to proscribe only conduct fueled by a discriminatory intent," and stating that "the ADA evolved from an attempt to remedy the effects of 'benign neglect' resulting from the 'invisibility' of the disabled"); *Crowder v. Kitagawa*, 81 F.3d 1480, 1483-84 (9th Cir. 1996) (concluding that "Congress intended to prohibit outright discrimination, as well as those forms of discrimination which deny disabled persons public services disproportionately due to their disability," and holding that state's animal quarantine law violated ADA because it "burdens visually-impaired persons [with service animals] in a manner different and greater than it burdens others[,] . . . effectively den[ying] these persons . . . meaningful access to state services, programs, and activities while such services, programs, and activities remain open and easily accessible by others"); *see also* DOJ TITLE II MANUAL, *supra*, at II-3.7200 ("[A public entity's blanket denial of] a license to all individuals who have missing limbs, for example, would be discriminatory if an individual who could operate a vehicle safely without use of the missing limb were denied a license. A public entity, however, could impose appropriate restrictions as a condition to obtaining a license, such as requiring an individual who is unable to use foot controls to use hand controls when operating a vehicle.").[36]

A public entity is, of course, free to impose appropriate restrictions, such as requiring that a person with gender dysphoria submit documentation to confirm that the person has undergone gender transition as medically indicated for that individual. *See, e.g.*, N.J. STAT. ANN. § 26:8-49

---

[36] *See also* 28 C.F.R. pt. 35, app. B ("[R]equiring presentation of a driver's license as the sole means of identification for purposes of paying by check would violate this section in situations where, for example, individuals with severe vision impairments or developmental disabilities or epilepsy are ineligible to receive a driver's license and the use of an alternative means of identification, such as another photo I.D. or credit card, is feasible.").

(permitting corrections to birth certificates "by any person whose birth report is in error provided substantiating documentary proof, satisfactory to the State registrar or any local registrar, is submitted therewith and noted by said State registrar or local registrar upon the written request for correction"); *id.* § 26:8-53 ("The State department or local registrars may refuse to accept corrections or amendments unless supported by adequate documentary evidence presented at the time the request for correction or amendment is made."). But that is not what Defendants have done; the SRS requirement is not an appropriate or tailored restriction—it is a blanket denial of accurate birth certificates to all people with gender dysphoria who do not undergo the State's preferred form of medical treatment.

## C. Defendants Have Failed to Reasonably Modify the SRS Requirement for a Subclass of People with Gender Dysphoria.

Lastly, the Defendants have failed to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." *Id.* § 35.130(b)(7)(i); *see* Am. Compl. ¶¶ 113, 123. Specifically, the Defendants have failed to modify the SRS requirement to permit a subclass of people with gender dysphoria—those who do not need or undergo genital surgery—to receive an accurate birth certificate. The state could do this in a variety of ways, including, for example, by simply requiring an alternative form of medical documentation. "[T]he demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities is sufficient to sustain a claim for a reasonable accommodation." *Bloomberg*, 331 F.3d at 277, *quoted in Baxter v. Pennsylvania Department of Corrections*, 661 Fed. Appx. 754, 757 (3d Cir. 2016); *see id.* at 276 ("[T]he statute itself does not literally require a showing of 'discrimination.' A plaintiff can prevail either by showing 'discrimination' *or* by showing 'deni[al of] the benefits' of public services.") (emphasis added).

20

Furthermore, Defendants do not—and cannot—"demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). For example, modification of the SRS requirement would not forbid Defendants from requiring some *other* form of proof of treatment for gender dysphoria. Indeed, New Jersey law already permits people with gender dysphoria to change the sex classification on their driver's licenses absent SRS, *see* Am. Compl. ¶¶ 8, 55, 81;[37] extending this same opportunity to people with gender dysphoria in the birth certificate context is hardly unreasonable. *See, e.g., Helen L.*, 46 F.3d at 337-38 (holding that modification of state policy to permit plaintiff to receive health care services at home rather than in a nursing home did not constitute a "fundamental alteration" of services); *Bloomberg*, 331 F.3d at 279-80 (stating that "Title II seeks principally to ensure that disabilities do not prevent access to public services where the disabilities can reasonably be accommodated," and holding that accommodation designed to facilitate people with HIV's access to public services was reasonable because, *inter alia*, "it does not appear to impose costs that obviously outweigh its benefits"); *Strathie v. Department of Transp.*, 716 F.2d 227, 232-34 (3d Cir. 1983) (rejecting state's arguments in support of categorical exclusion of hearing aid wearers from obtaining school bus driver's licenses, and remanding for determination of whether driver's license requirement could be reasonably modified under Rehabilitation Act); *Soto v. City of Newark*, 72 F. Supp. 2d 489, 496 (D.N.J. 1999) (holding that state violated ADA by refusing to reasonably modify its municipal wedding program by providing sign-language interpreters, and stating that such modification "would impose little burden. Indeed, the Municipal Court routinely

---

[37] The federal government and various sister states similarly allow sex classification changes to a host of official documents without requiring SRS. *See, e.g.*, Transgender Law Center, *State-by-State Overview: Rules for Changing Gender Markers on Birth Certificates* (April 2017), http://transgenderlawcenter.org/wp-content/uploads/2016/12/Birth-Cert-overview-state-by-state.pdf (no surgery requirement in thirteen states plus D.C.); *see also* Compl. ¶ 81.

supplies sign-language interpreters for other Municipal Court functions."); *Galloway*, 816 F. Supp. at 16-20 & n.5 (holding that categorical exclusion of blind people from juries, "without even considering or offering accommodation," violated Rehabilitation Act and ADA).

In any event, whether a modification is reasonable depends on the facts of the case and therefore cannot be decided on a motion to dismiss. *See Williams v. Philadelphia Housing Authority Police Dept.*, 380 F.3d 751, 771 (3d Cir. 2004) ("[T]he question of whether a proposed accommodation is reasonable is a question of fact.").

## III. Plaintiff is a Qualified Individual with a Disability Under the ADA and Rehabilitation Act.

The Plaintiff is a qualified individual with a disability under the ADA and Rehabilitation Act because: (A) gender dysphoria is not excluded from the definition of disability; (B) Plaintiff's gender dysphoria meets the definition of disability; and (C) Plaintiff meets the essential eligibility requirements for receipt of an accurate birth certificate, with or without reasonable accommodation.

### A. Gender Dysphoria is Not Excluded Under the ADA or Rehabilitation Act.

Gender dysphoria is not within the scope of the ADA's and Rehabilitation Act's exclusion of "gender identity disorders not resulting from physical impairments" and "transsexualism,"[38] the latter of which has always been understood to be either interchangeable with, or a subtype of, GID (collectively, the "GIDs Exclusion").[39] There are three distinct statutory interpretations that

---

[38] "It was not uncommon at the time [the ADA was being debated] for people to use the terms 'transsexualism' and 'GID' interchangeably." Duffy, *supra* note 9, at 16-48; *see also id.* 16-98 – 103 (explaining that successive versions of the DSM referred to transsexualism as a subtype of GID applicable to adults and adolescents until 1994, when transsexualism was removed from the DSM). For a graphic depiction of the organization of GIDs, transsexualism, and gender dysphoria in the various editions of the DSM, see app. B.

[39] 42 U.S.C. § 12211(b)(1) (ADA exclusion). After excluding "gender identity disorders not resulting from physical impairments" from the ADA in 1990, Congress passed an identical

support this conclusion: as the court held in *Blatt v. Cabela's Retail, Inc.*, the GIDs Exclusion

refers simply to transgender identity—not to disabling conditions like gender dysphoria that

transgender people may have;[40] gender dysphoria is not the same as a "gender identity disorder,"

*see* Am. Compl. ¶¶ 63-66, 69-70;[41] or, as the United States has argued in *Blatt*, in *Doe v. Dzurenda*,

and in this case, gender dysphoria "result[s] from [a] physical impairment[]," *see* Am. Compl. ¶¶

6-7, 63-66, 69-70.[42]

---

exclusion to the Rehabilitation Act two years later. *See* Rehabilitation Act Amendments Act of 1992, Pub. L. No. 102–569, 106 Stat. 4344 (exclusion codified at 29 U.S.C. § 705(20)(F)(i)). Because "[t]he ADA largely mirrors Section 504 of the RA," the Third Circuit "ha[s] construed the provisions of the RA and the ADA in light of their close similarity of language and purpose." *Frederick L.*, 364 F.3d at 491; *see id.* at 490 & n.2.

[40] *See* Blatt v. Cabela's Retail, Inc., No. 5:14-CV-04822, 2017 WL 2178123, at *4 (E.D. Pa. May 18, 2017) (holding that gender dysphoria is not excluded by the ADA); *see also* Pl.'s Mem. Law in Opp'n Def.'s Mot. Dismiss at 55-57, Doe v. Dzurenda, No. 3:16-CV-1934 (D. Conn. June 28, 2017), ECF No. 39-1 [hereinafter *Dzurenda* Mem. Law in Opp'n] (discussing *Blatt* decision); *see generally* Kevin Barry & Jennifer Levi, *Blatt v. Cabela's Retail, Inc. and a New Path for Transgender Rights*, 127 THE YALE LAW JOURNAL FORUM 373 (2017), *available at* https://www.yalelawjournal.org/forum/blatt-v-cabelas-retail-inc-and-a-new-path-for-transgender-rights (same). To date, *Blatt* is the only decision that has analyzed whether the GIDs Exclusion extends to gender dysphoria in light of the ADA's text, structure, and legislative history.

[41] *See* Brief of Amici Curiae Gay & Lesbian Advocates & Defenders et al. in Opp'n to Def.'s Part'l Mot. Dismiss at 6, Blatt v. Cabela's Retail, Inc., No. 5:14-cv-4822-JFL, 2015 WL 1322781 (E.D. Pa. Jan. 23, 2015), ECF No. 33 [hereinafter *Blatt* Amic. Br.] ("In 2013, the DSM-5 changed the GIDs diagnosis in four important ways: it renamed the diagnosis, it revised the diagnostic criteria underlying the diagnosis, it re-categorized the diagnosis within the DSM, and it referenced new science supporting the physiological etiology of the diagnosis."); *see also id.* at 12-15 (discussing differences between "gender identity disorders" and gender dysphoria); *Dzurenda* Mem. Law Opp'n, *supra* note 40, at 57-60 (same); Kevin M. Barry et al., *A Bare Desire to Harm: Transgender People and the Equal Protection Clause*, 57 B.C. L. REV. 507, 516-26 (2016) (same). *But see Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 662 n.4 (W.D. Pa. 2015) (stating, in dictum in a non-ADA case, that the DSM-5 "replaced the diagnostic name 'gender identity disorder' with 'gender dysphoria,'" without any analysis of the differences between the two diagnoses and whether the GIDs Exclusion applies to the new diagnosis of gender dysphoria in light of the ADA's text, structure, and legislative history), *disagreed with on other grounds by Whitaker*, 858 F.3d at 1047.

[42] Stat. of Int. of U.S. at 2, Doe v. Arrisi, No. 3:16-cv-08640, ECF No. 49 (quoting 42 U.S.C. § 12211(b)); *accord.* Stat. of Int. of U.S. at 2-3, Doe v. Dzurenda, No. 3:16-CV-1934 (D. Conn. Oct. 27, 2017), ECF No. 57; DOJ *Blatt* Statement, *supra* note 9, at 5-6. If this Court does not agree with any of these three interpretations, there is a fourth: the ADA excludes only *sexual behavior*

If this Court decides that gender dysphoria *is* excluded from the ADA and Rehabilitation Act, this Court should hold that the GIDs Exclusion violates equal protection.[43]  Specifically, the GIDs Exclusion is a transgender classification that fails heightened scrutiny because it is not narrowly tailored or substantially related to the achievement of a compelling or important governmental interest. *See, e.g., Whitaker*, 858 F.3d at 1051-52 (applying "heightened review" to transgender classification and concluding that school district failed to meet its burden under Equal Protection Clause); *Doe 1*, 2017 WL 4873042, at *26-29 (applying "intermediate level of scrutiny" to transgender classification and holding that current and aspiring transgender service members were likely to succeed in demonstrating violation of equal protection).[44]  If heightened scrutiny

---

*disorders.* Congress's use of the words "or *other* sexual behavior disorders" in the GIDs Exclusion creates ambiguity in the statute with respect to gender identity disorders and transsexualism, which were *never* sexual behavior disorders. 42 U.S.C. § 12211(b)(1).  Indeed, they are the *only* two conditions in the exclusion that are *not* sexual behavior disorders.  This Court can resolve the ambiguity by interpreting the GIDs Exclusion to apply only to "sexual behavior disorders"—not gender identity disorders and transsexualism, or, at the very least, not the new diagnosis of gender dysphoria. *See Blatt* Amic. Br., *supra* note 41, at 15-17 (arguing that "Gender Dysphoria falls outside the scope of the GIDs Exclusion" because "it is not a sexual behavior disorder"); *see also* Duffy, *supra* note 9, at 16-88 (same).

[43] Should this Court determine that gender dysphoria is excluded from the ADA, Amici respectfully request the right to file a supplemental amicus brief addressing the equal protection issue at that time.  For a discussion of this issue, see Pl.'s Mem. Law in Opp'n Def.'s Part'l Mot. Dismiss at 15-39, Blatt v. Cabela's Retail, Inc., No. 14-4822, 2015 WL 1360179 [hereinafter *Blatt* Mem. Law in Opp'n] (E.D. Pa. Jan. 20, 2015), ECF No. 23 (arguing that ADA's transgender classification violates equal protection); *accord. Dzurenda* Mem. Law in Opp'n, *supra* note 40, at 61-69 (same); Barry et al., *A Bare Desire to Harm, supra* note 41, at 540-77 (same); Duffy, *supra* note 9, at 16-129 to -131 (same).

[44] There are two theories under which courts have applied heightened scrutiny to transgender classifications. *Compare* cases holding that heightened scrutiny is warranted because transgender people satisfy the criteria of a suspect/quasi-suspect class, *see, e.g., Doe 1*, 2017 WL 4873042, at *27-28 (applying "intermediate level of scrutiny" because "discrimination on the basis of someone's transgender identity is a quasi-suspect form of classification that triggers heightened scrutiny"), *Adkins*, 143 F. Supp. 3d at 139-40 (applying "intermediate scrutiny" because "transgender people are a quasi-suspect class"), *Evancho*, 237 F. Supp. 3d at 288 (concluding that "all of the indicia for the application of the heightened intermediate scrutiny standard are present" for transgender individuals, and applying "an intermediate standard of Equal Protection review"), *and Bd. of Educ. of the Highland Local Sch. Dist.*, 208 F. Supp. 3d at 874 (concluding that

24

does not apply, the GIDs Exclusion fails even the most minimal level of scrutiny because it is

rooted in moral animus against transgender people, *see* app. C,[45] and such "a bare [congressional]

---

"transgender status is a quasi-suspect class under the Equal Protection Clause"), *with* cases holding that heightened scrutiny is warranted because discrimination based on gender identity is a form of sex discrimination, *see, e.g.*, *Whitaker*, 858 F.3d at 1051 (applying "heightened review" because school district's bathroom policy, which required transgender students to use the bathroom consistent the sex listed on their birth certificates, was "inherently based upon a sex-classification"); *Glenn v. Brumby*, 663 F.3d 1312, 1316, 1319 (11th Cir. 2011) (affirming trial court's grant of summary judgment in favor of transgender employee because "discriminating against someone on the basis of his or her gender non-conformity constitutes sex-based discrimination under the Equal Protection Clause" and is therefore "subject to heightened scrutiny"); *Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004) (holding that transgender employee's "claims of gender discrimination . . . easily constitute a claim of sex discrimination grounded in the Equal Protection Clause"), *and Doe 1*, 2017 WL 4873042, at *27-28 (applying "intermediate level of scrutiny" because transgender discrimination is "a form of discrimination on the basis of gender, which is itself subject to intermediate scrutiny").

[45] The ADA's legislative history, see app. C, reveals that the GIDs Exclusion was based on the moral opprobrium of two senior senators, conveyed in the eleventh hour of a marathon day-long floor debate, who erroneously believed that GIDs were "sexual behavior disorders" undeserving of legal protection. *See, e.g.*, 135 Cong. Rec. S10753, *available at* 1989 WL 183115 (daily ed. Sep. 7, 1989) ("I could not imagine the [ADA] sponsors would want to provide a protected legal status to somebody who has such [mental] disorders, particularly those [that] might have a moral content.") (statement of Sen. Armstrong) (emphasis added); *id.* at S10768, *available at* 1989 WL 183216 ("If this were a bill involving people in a wheelchair or those who have been injured in the war, that is one thing. But how in the world did you get to the place that you did not even [ex]clude transvestites? What I get out of all of this is here comes the U.S. Government telling the employer that he cannot set up any moral standards for his business by asking someone if he is HIV positive, even though 85 percent of those people are engaged in activities that most Americans find abhorrent.") (statement of Sen. Helms); *id.* at S10796 ("In short, we are talking about behavior that is immoral, improper, or illegal and which individuals are engaging in of their own volition, admittedly for reasons we do not fully understand.") (statement of Sen. Rudman); *id.* at S11175, *available at* 1989 WL 183785 (daily ed. Sept. 14, 1989) (advocating exclusion of "sexual behavior disorders: Transvestism and Transsexualism") (supplemental statement of Sen. Armstrong); *see also* Blatt Mem. Law in Opp'n, *supra* note 43, at 30 ("[T]o argue that moral animus was not the primary motivation for excluding the subset of mental impairments that these Senators viewed as morally problematic runs contrary to the words explicitly spoken on the Senate Floor on September 7, 1989."); Barry et al., *A Bare Desire to Harm*, *supra* note 41, at 574 ("Senators Armstrong, Helms, and Rudman repeatedly invoked immorality as the justification for the transgender exclusions, decrying the ADA's coverage of "sexually deviant behavior."); *accord Duffy*, *supra* note 9, at 16-38 to -39 (compiling ADA's legislative history); Ruth Colker, *Homophobia, AIDS Hysteria, and the Americans with Disabilities Act*, 8 J. GENDER RACE & JUST. 33, 36-38, 42-44, 50 (2004) (same).

desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." *Romer v. Evans*, 517 U.S. 620, 634-35 (U.S. 1996) (emphasis in original) (quoting *U.S. Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973)); *see also Cleburne*, 473 U.S. at 446 ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.").

### B. Plaintiff's Gender Dysphoria Meets the Definition of Disability Under the ADA and Rehabilitation Act.

Because of the date of the actions complained of, the expanded definition of "disability" under the ADA Amendments Act of 2008 ("ADAAA") applies to this case.   *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (codified at 42 U.S.C. §§ 12101-13 (2009)) [hereinafter ADAAA]).  The definition of disability under the ADA and Rehabilitation Act is identical; the expanded definition of "disability" under the ADAAA applies with equal force to both statutes. *Compare* 42 U.S.C. § 12102 (defining "disability"), *with* 29 U.S.C. §§ 705(9)(B), (20)(B) (cross-referencing ADA definition of "disability"); *see also* ADAAA, *supra*, §7 (conforming Section 504 of Rehabilitation Act's definition of "disability" to definition of disability "in section 3 of the Americans with Disabilities Act of 1990").

Under the ADAAA and DOJ regulations, the definition of disability is to be construed broadly in favor of expansive coverage.   42 U.S.C. §§ 12102(4)(A)-(B); 28 C.F.R. §§ 35.108(a)(2)(i), (d)(1)(i).  In determining whether an impairment substantially limits a major life activity, the ADAAA states that: impairments must be assessed "without regard to the ameliorative effects of mitigating measures," such as medication, therapy, and reasonable accommodations, 42 U.S.C. § 12102(4)(E)(i); impairments that are "episodic or in remission" must be assessed in their active state, *id.* § 12102(4)(D); and a "major life activity" includes "the operation of a major bodily function," including neurological, brain, endocrine, and reproductive functions, *id.* § 12102(2)(B).

26

The Plaintiff easily meets the definition of disability under all three prongs of the ADA. She is disabled under the first and second prongs of the definition of disability, *id.* §§ 12102(1)(A)-(B), because her gender dysphoria, *when considered in its active state and without regard to the ameliorative effects of treatment*, substantially limits her in a range of major life activities, "including, but not limited to, interacting with others, reproducing, and social and occupational functioning." Am. Compl. at ¶¶ 69-70.[46]

The Plaintiff also "meets the requirement of 'being regarded as having' an impairment that substantially limits one or more major life activities" because she "has been subjected to an action prohibited under th[e ADA]" because of gender dysphoria—namely, Defendants' refusal to issue Plaintiff an accurate birth certificate absent SRS. 42 U.S.C. § 12102(3)(A); *see also* Am. Compl. ¶¶ 29, 35, 110, 120; 28 C.F.R. § 35.108(a)(2)(iii) ("[T]he 'regarded as' prong of the definition of 'disability' . . . does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment.").

### C. Plaintiff is a "Qualified Individual" Because She Meets the Essential Eligibility Requirements for Receipt of an Accurate Birth Certificate, With or Without Reasonable Accommodation.

Plaintiff is a "qualified individual" within the meaning of Title II of the ADA because she "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity," "with or without reasonable modifications to rules, policies, or practices." 42 U.S.C. § 12131(2). According to the DOJ, "[t]he 'essential eligibility requirements' for participation in many activities of public entities" are exceedingly minimal. *See* DOJ TITLE II MANUAL, *supra*, at II-2.8000 ("For example, most public entities

---

[46] When considered in its active state and without regard to the ameliorative effects of treatment, gender dysphoria also substantially limits the operation of "major bodily functions," including "endocrine" function and "reproductive" function. 42 U.S.C. § 12102(2)(B).

provide information about their programs, activities, and services upon request. In such situations, the only 'eligibility requirement' for receipt of such information would be the request for it."). That is the case here. The essential eligibility requirement for receipt of an accurate birth certificate in New Jersey is simply that one be born in the state. *See* N.J. STAT. ANN. § 26:8-23 ("The Department of Health shall . . . procure the prompt *and accurate* registration of . . . [births].") (emphasis added); *see also id.* § 26:8-25 ("The local registrar shall . . . make a complete *and accurate* copy of each birth . . . on a form or in a manner prescribed by the State registrar . . . .") (emphasis added). Plaintiff meets this essential eligibility requirement because she "was born in the State of New Jersey." Am. Compl. ¶ 2.

Even if the presence of particular external genitalia is considered to be an eligibility requirement for receiving an accurate birth certificate, it is not an "essential" one and can easily be modified, as demonstrated by New Jersey law's allowance of sex classification changes to driver's licenses without requiring SRS, *see* Am. Compl. ¶¶ 8, 55, 81, the federal government's and thirteen sister states' allowance of sex classification changes to a host of official documents without requiring SRS, *see* Transgender Law Center, *supra* note 37; Am. Compl. ¶ 81, and the fact that external genitalia are merely one of a number of readily determinable characteristics— including gender identity, hormones, and secondary sex characteristics—that come together to define one's sex, *see supra* section II.A. At any rate, according to the DOJ, "[w]hether a specific requirement is 'essential' will depend on the facts of the particular case" and therefore cannot be decided on a motion to dismiss. DOJ TITLE II MANUAL, *supra*, at II-3.7200.

## CONCLUSION

For the forgoing reasons, this Court should deny the Defendants' Motion to Dismiss the Plaintiff's ADA and Rehabilitation Act claims.

Respectfully Submitted,

Kevin Barry
Quinnipiac University School of Law Legal Clinic
275 Mount Carmel Ave.
Hamden, Connecticut 06518
(203) 582-3238 (tel)
*Counsel for Amici Curiae*
legalclinic@quinnipiac.edu

s/ Paul R. Fitzmaurice
Paul R. Fitzmaurice
Paul R. Fitzmaurice, P.C.
130 Linden Avenue
Haddonfield, NJ 08033
(856) 287-4902
*Local Counsel for Amici Curiae*
PaulRFitzmaurice@gmail.com

Dated: November 21, 2017